# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Roche Diagnostics Corporation, | : | |
| Plaintiff, | : | |
| v. | : | |
| Meso Scale Diagnostics, LLC | : | |
| Defendant. | : | C.A. No. 17-189-LPS |
| Meso Scale Diagnostics, LLC, | : | |
| Counterclaim-Plaintiff, | : | |
| v. | : | |
| Roche Diagnostics Corporation and BioVeris Corporation, | : | |
| Counterclaim-Defendants. | : | |

Joel Friedlander, Christopher Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, DE

James T. McKeown, Jefferey N. Costakos, Eric L. Maasen, Kimberly K. Dodd, Rachel M. Blise, Phillip C. Babler, FOLEY & LARDNER, LLP, Milwaukee, WI

    Attorneys for Roche Diagnostic Corporation and BioVeris Corporation

Jack B. Blumenfeld, Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Steven E. Derringer, Anastasiya Maione, BARLITT BECK LLP, Chicago, IL

John M. Hughes, Nosson D. Knobloch, Daniel C. Taylor, BARLITT BECK LLP, Denver, CO

    Attorneys for Meso Scale Diagnostics, LLC

## MEMORANDUM OPINION

November 30, 2020
Wilmington, Delaware

**STARK, U.S. District Judge:**

Beginning on November 12, 2019, the Court held a six-day jury trial in this contract and patent-related infringement action. (*See* D.I. 296, 297, 298, 299, 300, 301, 302) ("Tr.")[1] The jury returned a verdict in favor of Meso Scale Diagnostics, LLC ("Meso" or "Plaintiff"), finding that Roche Diagnostics Corp. ("Roche") and BioVeris Corp. ("BioVeris") (collectively "Defendants") willfully infringed and/or induced infringement of U.S. Patent No. 6,808,939 ("the '939 patent") claim 33, U.S. Patent No. 5,935,779 ("the '779 patent") claim 1, and U.S. Patent No. 6,165,729 ("the '729 patent") claims 38 and/or 44 – claims with respect to which the jury also found Meso had exclusive licenses. (D.I. 276) The jury awarded Meso damages of $137,250,000. (*Id.*)

Pending before the Court are the parties' various post-trial motions. (D.I. 287, 290) The parties submitted extensive briefing and related materials. (*See* D.I. 288-89, 291, 303-05, 307-08) The Court heard telephonic oral argument on May 6, 2020. (D.I. 315) ("Arg. Tr.")

## I.     BACKGROUND

This case involves patents for electrochemiluminescence (or ECL) technology that were once owned by IGEN International, Inc. ("IGEN") and are now owned by BioVeris. ECL is a kind of luminescence in which light is produced during electrochemical reactions in a solution. (D.I. 238 Ex. 1 at ¶ 15) (Pretrial Order Uncontested Facts) ("UF") One application of ECL is for the detection and quantification of specific substances in a test sample. (*Id.*)

IGEN was founded in 1982 by its CEO Samuel Wohlstadter and two business partners.

---

[1] Citations to the trial transcript are in the form: "([Witness last name] Tr. [page])." Citations to the record are generally to Plaintiff's ("P") and Defendants' ("D") exhibits as provided by the parties in appendices (*see, e.g.*, D.I. 289, 291) unless otherwise noted, and pin cites are generally to the last three digits of the accompanying Bates numbers unless inapplicable.

(UF ¶ 16)  In 1992, IGEN entered into a license agreement (the "1992 License") authorizing Boehringer Mannheim GmbH ("Boehringer") to develop, use, manufacture, and sell ECL assays and instruments limited to a specific "Field": "use in hospitals (except where the performance of the Assay takes place at the side of the patient), blood banks and clinical reference laboratories." (UF ¶ 18)  In 1998, Roche purchased Boehringer, so Roche became the licensee under 1992 License.  (D.I. 153 at 1-2)  Beginning in 1994, IGEN and Roche had been selling ECL instruments.  (*Id.* at 2)

At around the same time, Jacob Wohlstadter, the son of IGEN's CEO, was researching multi-array methodologies at another entity, Meso Scale Technologies ("MST").  (D.I. 153 at 2)  In 1995, IGEN and MST signed a Joint Venture Agreement ("JVA") and formed Meso Scale Diagnostics, LLC – the party to this litigation (and the party referred to in this Memorandum Opinion as "Meso").  (UF ¶ 19; P11)  The JVA provided that "MST and IGEN have jointly prepared a Research Outline for a program of research and development (the 'Research Program') to be conducted by" Meso.  (P11 at *546)  The Recitals section in the JVA further provided that Meso was "organized for the purpose of conducting this research and development and, if successful, developing, manufacturing, marketing and selling products, processes, and services."  (*Id.*)  Under the JVA, MST contributed to Meso an exclusive license to its intellectual property while IGEN contributed an exclusive license, significant financial investment, office and laboratory facilities, and research personnel.  (D.I. 153 at 2)

Attached to the JVA was a license agreement between IGEN and Meso ("the 1995 License").  (UF ¶ 20; P12)  Section 2.1 of the 1995 License grants to Meso "an exclusive, worldwide, royalty-free license to practice the IGEN Technology to make, use, and sell products or processes (A) developed in the course of the Research Program, or (B) utilizing or related to

2

the Research Technologies." (UF ¶ 20; P12 at *678)

"IGEN Technology" is defined in Section 1.3 of the 1995 License as "all inventions, know-how, methods, procedures and other technology, whether or not patented or patentable, now or hereafter owned by, licensed to, or otherwise obtained by, IGEN . . . including IGEN Technology, and rights under all patents and patent applications relating to the foregoing." (P12 at *677-78)  The "IGEN Technology" that Meso may practice includes the patents that Meso is asserting against Roche in this case. (UF ¶ 20)

"Research Technologies" is defined in Section 1.11 of the JVA as "(i) selection and screening methods, . . . (ii) modified electrodes, . . . and (iii) multi-array diagnostic . . . 'Research Technologies' specifically include, but are not limited to, . . . agents to extend the electrical potential of an electrode in the direction perpendicular to its surface . . . ." (P11 at *547)

On July 24, 2003, IGEN and Roche executed a new license agreement (the "2003 License") to give Roche a non-exclusive license to IGEN's ECL technology limited to the specific field of human patient diagnostics. (See UF ¶ 22; D.I. 153 at 3-4; P44 at *865-66) Meso consented to the 2003 License, and consented to and joined in the licenses granted by it. (UF ¶ 23)  As part of the 2003 transaction, IGEN's patent and other intellectual property as well as IGEN's ownership interest in the Meso joint venture were transferred to a new company: BioVeris. (UF ¶ 25)  Shareholders of IGEN stock received shares of BioVeris stock. (Id.)  In 2007, a Roche affiliate acquired BioVeris and its 100+ patents for about $600 million. (See UF ¶ 26)

In June 2010, Meso sued Roche in the Delaware Court of Chancery. (See D.I. 153 at 4) Meso claimed, among other things, that Meso was a party to the 2003 License and had a right to

enforce its provisions. (*See* D.I. 99 at 7)  Following a one-week bench trial in early 2013, Vice Chancellor Parsons concluded that Meso had consented to but was not a party to the 2003 License Agreement between IGEN and Roche, and further that only BioVeris (as IGEN's successor-in-interest) could enforce the 2003 License Agreement against Roche for sales made outside the field defined in the 2003 License. *See Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 2014 WL 2919333 (Del. Ch. June 25, 2014).  In June 2015, the Delaware Supreme Court affirmed the Chancery decision. *See Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 116 A.3d 1244 (Table) (Del. 2015).

Roche filed the instant action in this Court on February 22, 2017, seeking a declaration "confirming that Roche does not infringe any license rights of defendant Meso in a patented diagnostics detection technology known as electrochemiluminescence." (D.I. 1 ¶¶ 1, 30-39)  In response, in April 2017, Meso filed counterclaims, including for patent infringement and breach of the 1995 License between IGEN and Meso. (D.I. 10)  This case has been heavily litigated, resulting in, *inter alia*, decisions on motions for summary judgment and *Daubert* motions (*see, e.g.*, D.I. 153, 219, 235), and culminating in the November 2019 jury trial and the pending post-trial motions.

## II.    LEGAL STANDARDS

A post-trial motion for judgment as a matter of law ("JMOL") is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on an issue." Fed. R. Civ. P. 50(a)(1).  "Entry of judgment as a matter of law is a sparingly invoked remedy," one "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir 2007) (internal quotation marks omitted).

To prevail on a renewed motion for judgment as a matter of following a jury trial, the moving party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion implied [by] the jury's verdict cannot in law be supported by those findings." *Panny v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (internal quotation marks omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the records in light most favorable to him." *Williamson v. Consol. Rail. Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991); *see also Perkin-Elmer Corp.*, 732 F.2d at 893. The Court may not assess the credibility of witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Id.* Rather, the Court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Ky Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.").

A party may also move for a new trial. Federal Rule of Civil Procedure 59(a) provides in

pertinent part, "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows: . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." "Among the most common reasons for granting a new trial are: (1) when the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) when newly discovered evidence exists that would likely alter the outcome of the trial; (3) when improper conduct by an attorney or the court unfairly influenced the verdict; or (4) when the jury's verdict was facially inconsistent." *Amgen, Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 341 (D. Del. 2018) (internal quotation marks omitted); *see also Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992).

Although the standard for granting a new trial is less rigorous than the standard for granting judgment as a matter of law, in that the Court need not view the evidence in the light most favorable to the verdict winner, ordinarily a new trial should only be granted when a "miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352-56. The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yan Chem. Corp.*, 9 F.2d 282, 29 (3d Cir. 1993) (reviewing "district court's grant or denial of a new trial motion" under "abuse of discretion" standard).

## III. DISCUSSION

Both parties filed post-trial motions. The Court will address Roche's first, beginning with the portions of its motion relating to liability and then moving onto Roche's affirmative defenses and challenges to the jury's damages award. Then the Court will turn to Meso's motions, which concern enhanced damages, interest, and a running royalty.

A.      **Roche's Motions**

1.      **Liability**

a.      **Section 2.1 of the 1995 License**

The scope of the rights received by Meso pursuant to Section 2.1 of the 1995 License has been a central issue throughout this case.  Meso has maintained that it has an exclusive right to practice IGEN's patent claims, a right which was triggered by the development during the Research Program of products and processes covered by those claims.  (*See, e.g.*, D.I. 153 at 7) Roche, by contrast, insists that Section 2.1 merely granted Meso the exclusive right to practice (i.e., to use) the IGEN Technology (including the four asserted patent claims) to make, use, and sell certain categories of products and processes tied to the Research Program (Section 2.1(A)) or Research Technologies (Section 2.1(B)).  (*See* D.I. 288 at 9)  On summary judgment, the Court concluded that the parties had collectively "articulated more than one reasonable interpretation of the contract provision," and therefore ordered that the issue be tried.  (*Id.* at 7-9)[2]

At trial, the jury ultimately agreed with Meso's interpretation.  The jury found that Meso proved by a preponderance of the evidence that Section 2.1 provides Meso an exclusive license to the entirety of claim 33 of the '939 patent, claim 1 of the '779 patent, and claims 38 and/or 44 of the '729 patent.  (D.I. 276)  Roche now moves for JMOL on the basis that the jury lacked sufficient evidence to find that Section 2.1 gave Meso an exclusive license to the entirety of the four asserted patent claims.  (D.I. 288 at 9-15; D.I. 308 at 5-8)  In particular, Roche contends that no reasonable jury could have made such a finding because (i) the 1995 License Agreement and

---

[2] As the Court finds that sufficient evidence supports the jury's verdict, Meso's argument that the Court's summary judgment decision is the of law this case and "disposes of Roche's post-trial rehash of its already-rejected 'no reasonable jury' gambit" need not be addressed.  (*See* D.I. 303 at 12)

JVA do not give Meso exclusive rights to patent claims, no matter what products or processes

Meso "developed" in the Research Program (D.I. 288 at 9-13); (2) the evidence did not support a

finding that Meso developed the sulfonated ruthenium labels covered by the '939 patent in the

Research Program (*id.* at 13-14); and (3) the evidence did not support the jury's finding that TPA

is within the definition of "Research Technologies" (*id.* at 14-15).[3]  Roche also seeks a new trial,

reasoning that Meso's position was contrary to the clear weight of the evidence.  The Court will

deny Roche's motion.

The jury heard from two witnesses who had been involved in the negotiation and drafting

of the 1995 License.  (D.I. 303 at 12)  First, Meso's founder and President, Jacob Wohlstadter,

testified that the parties intended "IGEN Technology" in Section 2.1 – defined in the JVA to

mean "all inventions, know-how, methods, procedures and other technology, whether or not

patented or patentable, now or hereafter owned by, licensed to, or otherwise obtained by, IGEN"

– to have a broad meaning, one encompassing IGEN's ECL patent claims, adding that he would

not have entered into the joint venture with IGEN unless Meso was granted these broad rights.

(Wohlstadter Tr. 287-93)  According to Wohlstadter, IGEN was not uncomfortable granting such

broad rights to Meso because IGEN maintained executive control and veto power over Meso

through the JVA.  (*Id.* at 277-78, 284-85, 289-90)[4]  The second witness, Richard Massey, who

had been IGEN's president and COO, testified by video deposition that he did not remember

---

[3] The Court discussed Delaware law related to contract interpretation in its prior
summary judgment decision (D.I. 153), which is incorporated herein by reference.

[4] For instance, Wohlstadter testified: "[I]f you look at the [JVA] . . . IGEN had executive
control over the joint venture. So they could veto anything [Meso] did. [Meso] couldn't do
anything unless [IGEN] agreed to put money into it. So [IGEN] was putting this exclusive
license into an entity, into a corporation that they had effective control of. [Meso was] literally
located in the same building with [IGEN], so it made complete sense." (Wohlstadter Tr. 289-90)

"any discussions [or] negotiations" concerning the 1995 License, and admitted he was not in a position "to give any opinions about the scope of [Meso's] rights;" instead, he was able to testify only that the "scope of [Meso's] rights are defined by the documents." (Massey Tr. 1676)  The jury was free to credit Wohlstadter's testimony on the parties' contemporaneous understanding of Section 2.1's scope and to view that testimony as unrebutted by Massey (or by any other evidence).

Roche emphasizes that Delaware law holds "subjective understandings of a party to a contract which are not communicated to the other party are of no effect." (D.I. 288 at 11) (quoting *Supermex Trading Co., Ltd. v. Strategic Sols. Grp., Inc.*, 1998 WL 229530, at *9 (Del. Ch. May 1, 1998))  But in the present procedural posture, it is improper to view the record as containing nothing more than Wohlstadter's unexpressed subjective belief.  Instead, Wohlstadter's testimony – along with all of the other record evidence the jury was free to credit – related also to objective business dynamics and IGEN's apparent intent with respect to Section 2.1.  A reasonable juror could have understood Wohlstadter's testimony to support a finding that IGEN entered into the "marriage" that created Meso intending for it to succeed, and granted Meso broad rights under Section 2.1 to improve the likelihood of such success, all while knowing IGEN could exercise its control over the joint venture to protect its own rights.  (*See, e.g.,* Wohlstadter Tr. 289-90)  On post-trial motions seeking to overturn a jury's verdict, the Court must presume that the jury reasonable drew all of these inferences in Meso's favor.

In addition to challenging the jury's finding that Section 2.1 gave Meso exclusive rights to the four patent claims, Roche argues that the evidence does not support the jury's finding that Meso developed the sulfonated ruthenium labels covered by the '939 patent as part of the Research Program.  (*See* D.I. 288 at 13-14; D.I. 308 at 6)  The Court disagrees.

Dr. James Wilbur testified that inventor Dr. Sigal's work developing the technology disclosed in the '939 patent was done as part of the Research Program. (Wilbur Tr. 569) The jury was provided evidence that Meso disclosed those developments in Research and Development Summaries and that IGEN confirmed those developments were part of the Research Program. (*Id.* at 573-74; P726) Meso correctly observes that Roche does not point to any contrary evidence. (D.I. 303 at 14) Instead, Roche focuses on the fact that in 2001 IGEN and Meso assigned the '939 patent to IGEN, rather than to Meso, contending that if Meso had developed the sulfonated ruthenium labels described in claim 33 of the '939 patent, the parties would have assigned the patent to Meso instead. (D.I. 308 at 6) The jury was free to reject this contention. The jury was likewise free to find that the 2001 assignment of the '939 patent to IGEN did not extinguish the patent rights Meso had already obtained to that patent through Section 2.1 and the work done as part of the Research Program. (*See* D.I. 303 at 13-14) Therefore, this portion of Roche's motion will be denied.

Roche also argues that the evidence did not support the jury's finding that tripropylamine ("TPA") is within the definition of "Research Technologies" in Section 1.11 of the 1995 License and, more specifically, that a reasonable jury could not have found that the parties intended for TPA to qualify as an "agent that extends the electric potential of an electrode in a direction perpendicular to its surface." (D.I. 288 at 14-15; D.I. 308 at 6-8; P11 at *547) Importantly, there is no dispute that TPA comes within the definition of Research Technologies. (*See* D.I. 303 at 14) However, according to Roche, it was not until 1999 – four years after the 1995 License was executed – that the scientific field came to understand that TPA reactions could occur away from the electrode surface. (D.I. 288 at 14) (citing Wilbur Tr. 548-551; Leventis Tr. 1308-09) Roche further argues that the examples of agents called out in Section 1.11 of the JVA (e.g.,

"electrically conducting polymers" and "conducting micro-particles") comport with a patent application Wohlstadter had filed eight months prior to the JVA, which is further evidence that the parties contemplated 1.11 to be limited to agents already known to meet its criteria and did not include TPA. (*See* D.I. 288 at 14-15)  Roche also focuses on evidence that at no point prior to 2007 did Meso tell anyone that it claimed any rights to TPA. (*Id.* at 15) (citing Wohlstadter Tr. 419-20, 443-44, 449-50, 460-61)

There was sufficient evidence to allow a reasonable jury to find that TPA is within the definition of Research Technologies.  Jacob Wohlstadter testified that the purpose behind the phrase "agents to extend" in the definition of Research Technologies was to capture the "airspace above the electrode surface" (Wohlstadter Tr. 305) and that this was not meant to be limited to any specific compound or chemical (*id.* at 308-09).  Additionally, when the parties amended Section 1.11 in 2001, which was two years after it had become known that a TPA reaction could occur away from the electrode surface, they made no effort to exclude TPA from the license's scope. (*See* D.I. 303 at 15-16)  The Court must presume that the jury drew these reasonable inferences, and all others permitted by the record, in Meso's favor.  Accordingly, the Court will deny this portion of Roche's motion.

In sum, viewing the evidence in the light most favorable to Meso and giving it the advantage of every fair and reasonable inference, substantial evidence supports the jury's verdict with respect to the broad rights accorded to Meso by Section 2.1 of the 1995 License.  Nor is there any meritorious basis to conclude that upholding the jury's verdict on these points results in a miscarriage of justice or a verdict that shocks the conscience or cries out to be overturned.  Thus, the portions of Roche's JMOL motion and request for a new trial that are based on its attacks on Section 2.1 will be denied.

**b.** **Induced Infringement of the '729 and '779 Patents**

The jury found that Meso met its burden to prove, by a preponderance of the evidence, that Roche induced its customers to directly infringe the asserted method claims of the '729 and '779 patents. (D.I. 276)  Roche moves for JMOL, or a new trial, on the bases that a reasonable jury could not have found that Roche committed an inducing act within the period of the applicable statute of limitations, could not have found that Roche acted with the requisite intent, and could not have found that specific sales were made to dual-use customers that were not permitted by the 2003 License.  (D.I. 288 at 14-18)

With respect to Roche's first argument, it is true that Meso was required to prove that Roche's alleged acts of inducement occurred during the relevant limitations period. *See Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 348 (Fed. Cir. 1985). Here, the parties agree inducement must have occurred sometime after April 2011 and during the relevant damages period.  In the context of resolving jury instruction disputes, the Court agreed with Meso that acts occurring ***prior*** to the damages period could support a finding of inducement if they "continue[d] to have an impact and cause[d] third parties to use the products-at-issue outside" of the licensed patient-diagnostics field after April 2011.  (*See* D.I. 274 at 32)  The Court adheres to that conclusion and measures the jury's verdict against the instructions the jury was given. *See generally Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (recognizing "the almost invariable assumption of the law that jurors follow their instructions"); *Dillinger v. Caterpillar, Inc.*, 959 F.2d 430, 440 n.17 (3d Cir. 1992) (appellate court reviewing request for new trial "must assume that the jury was competent to follow and did follow the instructions given").

The Court agrees with Meso that sufficient evidence supports the jury's apparent finding

of causation. The jury could have reasonably found that Roche's announcement to its customers following its 2007 acquisition of BioVeris that there was no longer any restriction on how and where its ECL products could be used, and Roche's subsequent and ongoing shipments of ECL to customers with no field-restriction labels, constituted acts of inducement having an impact and causing infringement after April 2011. (*See* D.I. 303) (citing P298 (Q&A); *id.* Ex. P392 (press release))

Roche's intent argument also fails. The specific intent required for induced infringement is that the alleged infringer knew or should have known his actions would induce actual infringement, which "may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement." *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 811 (D. Del. 2017). Sufficient evidence was presented from which the jury could reasonably have found Roche's intent to induce. For example, the jury heard of statements by Roche to its customers following the 2007 BioVeris acquisition to "please ignore the restrictions" that had been previously attached to ECL product packaging.[5] (*See* D.I. 303 at 17-18 (citing P392 at 9 (Roche press release); P287 (Q&A instructing employees to tell customer to "please ignore the restrictions"); Griffin Tr. 1406, 1421-22; Humer Tr. 836, 838-39))

---

[5] Unlike in the Hatch-Waxman cases on which Roche relies (D.I. 303 at 18 n.11) (citing *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625 (Fed. Cir. 2015); *Grunenthal GmbH v. Alkemm Labs., Ltd.*, 919 F.3d 1333, 1340 (Fed. Cir. 2019)), the pertinent language on Roche's labels was not placed there (nor removed from there) due to FDA regulations. It would have been reasonable, therefore, for the jury to base a finding of intent on (at least in part) Roche's removal of field restrictions from its labelling. *See also generally GlaxoSmithKline v. Teva*, 976 F.3d 1347, 1355 (Fed. Cir. 2020) (discussing indirect infringement in Hatch-Waxman context and explaining that "when the provider of an identical product knows of and markets the same product for intended direct infringing activity, the criteria of induced infringement are met").

Roche's position that Meso failed to prove specific sales to dual use customers not permitted by the 2003 License is also unavailing.  (*See* D.I. 288 at 17-18)  The Court agrees with Meso that Roche may not rely on the "incidental use" exception in Section 1.7(c) of the 2003 License to excuse all of its infringing sales to dual-use customers and, thereby, avoid a finding of induced infringement.  (D.I. 303 at 19)  Roche's own general counsel testified that following the 2007 acquisition, none of Roche's ECL products have been placed solely for in-field use.  (Keller Tr. 1098-99)  Meso argues (and the jury could have reasonably found) that "by lifting all restrictions on the fields in which its products could be used and instructing its customers about this change, Roche consented to its customers' out-of-field use in violation of the Section 1.7(c) exception."  (*See* D.I. 303 at 19) (citing Griffin Tr. 1431)  Therefore, Roche consented to its customers' out-of-field use and such use is not merely incidental.

The Court will, thus, deny Roche's JMOL motion and request for a new trial with respect to induced infringement.

### c.      **Meso's Waived Patent Claims**

The Court agrees with Roche that it is entitled to judgment with respect to certain patent claims that were disputed during this litigation and ultimately waived by Meso or otherwise not presented to the jury.  (*See* D.I. 288 at 20-21; D.I. 308 at 10)  Roche specifically seeks judgment that it "does not violate any of Meso's limited exclusive license rights in the ECL Technology under any of the BioVeris Patents issued in the United States," including U.S. Patent Nos. 6,881,536, 6,881,589, and 6,451,225, which Roche raised in its declaratory judgment complaint (D.I. 1 at ¶ 39 & Ex. 1) and on which Meso did not plead a counterclaim for infringement (*see* D.I. 42).  The Federal Circuit has held that when a patent "is at issue in an action for declaration of non-infringement, a counterclaim for patent infringement is compulsory and if not made is

deemed waived." *Vivid Techs., Inc. v. Am. Sci. & Eng'g Inc.*, 200 F.3d 795, 802 (Fed. Cir. 1999). Here, then, Meso waived any claim for infringement by Roche of U.S. Patent Nos. 6,881,536, 6,881,589, and 6,451,225.

Roche also seeks dismissal with prejudice of Meso's counterclaims for infringement of U.S. Patent Nos. 5,466,416 (Count 1), 5,714,089 (Count 2), 5,846,485 (Count 3), 5,962,218 (Count 5), 6,078,782 (Count 6), 6,271,041 (Count 8), and 6,316,608 (Count 9), all of which Meso dropped from the case less than three weeks before trial. (*See* D.I. 62; D.I. 244; D.I. 259 at 17; *see also* D.I. 263) The time for Meso to prove infringement of the asserted claims of these patents was at the trial in November 2019. Its decision not to press those claims at trial, after being given a full and fair opportunity to litigate those claims through discovery, motions practice, and trial, entitles Roche to judgment as a matter of law, as Meso has plainly failed to meet its burden of proof.

Accordingly, the portions of Roche's JMOL motion addressed in this section of the Court's opinion will be granted.[6]

### 2.    Defenses

#### a.    Patent Exhaustion

Roche has failed to prove that Meso's rights to assert claims of the '729 and '779 patents as to dual-use customers are barred by the doctrine of patent exhaustion. (D.I. 288 at 21-22; D.I. 308 at 11-12) Roche reasons that its sales to dual-use customers exhausted Meso's rights because no infringement occurred until the customer used the product out-of-field. (D.I. 288 at

---

[6] On November 23, 2020, the parties submitted a proposed order memorializing their agreement that Meso is henceforth "precluded from pursuing any claim based on its Disposable Electrodes Theory." (D.I. 316) The Court is today signing the parties' proposed order to that effect.

21)  The Court agrees with Meso that Roche's theory improperly ignores that the doctrine of

patent exhaustion only applies when the first sale is ***authorized***.  *See Impression Prods., Inc. v.*

*Lexmark Int'l, Inc.*, 137 S.Ct. 1523, 1535 (2017).  Here, there is sufficient evidence that Roche's

unrestricted first sales of ECL products violated the 2003 License and, therefore, were not

authorized.  (*See* D.I. 303 at 25)  Therefore, Roche's patent exhaustion defense fails.

### b.      Equitable estoppel

Equitable estoppel bars a patentee's infringement suit if "(1) the patentee, through

misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee

does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies

on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is

allowed to proceed with its claim."  *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir.

2013).  The required misleading conduct may be evidenced through the patentee's inaction.  *See*

*A.C. Aukerman Co. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992) (en banc).

Roche and BioVeris contend that each of them has an independent basis to equitably

estop Meso's infringement claims.  (*See* D.I. 288 at 23-25; D.I. 308 at 10-11)  Roche argues that

Meso was misleadingly silent ever since Roche's first potential infringement in 1996, as

exemplified by Meso's consent to the 2003 License, which Roche contends effectively endorsed

IGEN's representation that IGEN could convey to Roche sufficient title to the ECL technology

without concern for any rights that might belong to Meso.  (D.I. 288 at 25)  BioVeris argues that

Meso maintained misleading silence concerning its intention to raise patent infringement claims,

which led BioVeris to conclude to that its products did not infringe Meso's license.  (*Id.* at 23-

24)  BioVeris further contends that Meso's silence led to BioVeris's to make substantial

investment in R&D and the inability to reap the benefits of that investment will materially

prejudice BioVeris. (*Id.* at 24)

The Court agrees with Meso that Roche and BioVeris have failed to show that equitable estoppel is properly applied here. Roche's equitable estoppel defense rests on the premise that its first alleged infringement occurred in 1996 (i.e., when Meso's obligation to speak up purportedly began) – but this premise is fatally undermined by Roche's contention (on which it persuaded the Court) that the hypothetical negotiation date for damages purposes (which is also supposed to be the date of first infringement, *see, e.g.*, D.I. 236 at 4) is 2003-04. (D.I. 303 at 23) Roche and BioVeris have failed to show that, from 2003-04, Meso acted with misleading silence or inaction. To the contrary, Meso's Wohlstadter testified that immediately upon learning of Roche's plan to purchase BioVeris in 2003, he reached out to Roche's CEO to voice his concerns and to explain that Meso had rights to core ECL technology. (Wohlstadter Tr. 354-56) While Meso ultimately consented to the transaction, Meso's expressions at the time sufficiently raised the prospect that Meso considered itself to have patent rights it could assert against the combined Roche-BioVeris entity.

Roche's defenses to liability fail.

### 3.   Willfulness

The jury found that Roche's infringement of Meso's patent rights was willful. (*See* D.I. 276) Roche moves for JMOL, or a new trial, on willfulness. (*See* D.I. 288 at 18-19) In turn, Meso moves for enhanced damages pursuant to 35 U.S.C. § 284. (*See* D.I. 291 at 2-16) The Court agrees with Roche that, even drawing all reasonable inferences in Meso's favor, the verdict of willful infringement cannot be upheld. Even if this were not the case, the Court would not award enhanced damages.

#### a.   Jury finding of willful infringement

Proving willfulness requires a showing that an infringer has engaged in conduct that is

"willful, wanton, malicious, bad-faith, deliberate, consciously wrong, flagrant, or . . .

characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct 1923, 1932 (2016).

To prevail on a claim of willful infringement, then, a patentee must prove that the infringer acted

despite a risk of infringement that was "either known or so obvious that it should have been

known to the accused infringer." *Id.* at 1930. There must be proof of "misconduct beyond

typical infringement." *Id.*

   Willfulness largely turns on intent, which is an issue reserved to the jury. *See WBIP,*

*LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016). Thus, Roche's burden in asking this

Court to set aside the jury's willfulness finding is a "heavy one." *Comark Comms., Inc. v. Harris*

*Corp.*, 156 F.3d 1182, 1190 (Fed. Cir. 1998). Nevertheless, the Court concludes that Roche has

met its burden under the unusual circumstances presented here.

   As Roche points out, this is not a typical willfulness case, in which the issues include

whether the infringer's activities (such as the sale of a product) are covered by the scope of the

patentee's valid claims. (*See* D.I. 288 at 18; Arg. Tr. at 44) Here, instead, Roche's liability for

patent infringement turns entirely on contract interpretation. That is, Roche "had to interpret . . .

the 1995 License and JVA, both of which are construed based on the intent of IGEN and Meso at

the time of contracting." (D.I. 288 at 18) (citing *Rhone-Poulenc Basic Chemicals Co. v. Am.*

*Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)) Roche's interpretation of the operative

contracts was entirely reasonable, as the Court explained during the summary judgment stage

and reiterated above (in connection with analysis of Roche's challenge to the jury's liability

verdict). (*See* D.I. 152 at 9; *supra* at § III.A.1.a) While the jury sided with Meso, the jury could

have alternatively – and reasonably – sided with Roche (a verdict the Court would also have

upheld). On Roche's reasonable interpretation of the contract provisions, Roche had no liability

to Meso for patent infringement. In the Court's view, it follows logically that at no time did Roche have a subjective intent to infringe (or induce infringement of) Meso's patent rights.

Further, no reasonable juror could have found that Roche intended infringement, given at least the following evidence. First, Section 2.1 of the 1995 License does not expressly reference patent rights, and it was reasonable for Roche to believe that it did not convey patent rights to Meso (and to believe that Meso could not prove otherwise). (*See* P12 at *678; Wohlstadter Tr. 375, 384-85) Second, Roche was informed (by Meso CEO Jacob Wohlstadter's father) that Meso's license did ***not*** cover Roche's products, reasonably confirming for Roche that its actions were not infringing (and were not inducing infringement), defeating any contention that Roche intended infringement. (*See, e.g.*, Keller Tr. 1070) (Roche executive testifying that Sam Wohlstadter told him "don't worry about [Meso]. Sam and IGEN had all the right and that therefore Roche will have all the rights it needed.") Third, and relatedly, Roche relied on statements in IGEN's and BioVeris's SEC filings, which never disclosed that Meso had patent rights. (*See, e.g.*, P274 at Page 29 of 77) (BioVeris 10-K annual filing for fiscal year ending March 2007, stating "WE AND [MESO] MAY HAVE DIFFERENT VIEWS OF THE SCOPE OF THE EXCLUSIVE LICENSE TO OUR TECHNOLOGY GRANTED TO [MESO] . . . WHICH COULD AFFECT OUR ABILITY TO EXPAND OUR BUSINESS DIRECTLY OR THROUGH COLLABORATIONS") The jury heard evidence that Roche relied on these statements in concluding that Meso's license did not cover Roche's products. (*See, e.g.*, Keller Tr. 1007; Ruetsch Tr. 1172-73)

Viewing all the evidence in the light most favorable to Meso – including, of course, the evidence Meso contends supports willfulness (*see, e.g.*, D.I. 290 at 3) (pointing to, *inter alia*, 2001 due diligence memo from head of Roche's merger and acquisition team, Mr. Per-Olof

Attinger, identifying IGEN and Meso relationship as "roadblock" to Roche's acquisition of IGEN and recognizing certain Meso ECL rights, but also discussing "voluminous and convoluted contracts" at play and "unclear nature of the relationship" between IGEN, Meso, and MST; P104) – no reasonable jury could have found that Roche's actions (infringing or inducing infringement) were "willful, wanton, malicious, bad-faith, deliberate, consciously wrong, flagrant, or . . . characteristic of a pirate." Therefore, the jury's finding on willfulness will be vacated and Roche's motion for judgment as a matter of law of no willfulness will be granted.

### b.    No enhancement of damages

In the alternative, assuming that the verdict of willful infringement is supported by sufficient evidence, the Court would then confront the discretionary decision whether to enhance damages and, in that circumstance, the Court would not award enhanced damages. The Court's reasoning for this conclusion will be included below in its discussion of Meso's motions.

### 4.    Damages

The jury awarded Meso $137,250,000 in damages for Roche's infringement and induced infringement of Meso's patent rights. (D.I. 276) Roche challenges this damages award as not supported by sufficient evidence. Specifically, according to Roche, there is no evidence supporting Meso's reasonable royalty analysis or satisfying Meso's obligation to apportion damages. (*See* D.I. 288 at 3-8) As relief, Roche seeks either a new trial on damages or remittitur to a damages award of $20 million. The Court will deny these portions of Roche's motion.

Prior to trial, Meso's damages expert, Quentin Mimms, offered a reasonable royalty opinion based on a June 2007 hypothetical negotiation date and a hold-up damages theory (i.e., that Roche could not sell its products out-of-field without infringing Meso's patent rights so Roche needed, at essentially any cost, access to those rights, empowering Meso with substantial leverage). (*See* D.I. 174 Ex. 62 at ¶¶ 1, 8-11, 184-85) The Court precluded this opinion because

it relied on the wrong date of first infringement to arrive at a 2007 hypothetical negotiation date (rather than the correct 2003-04 date) and allocated the entire value of Roche's $600 million acquisition of BioVeris – and the 100 BioVeris patents Roche acquired in the transaction – to just the 10 patents Meso asserted in its counterclaims were "core (or essential)" patents.  (D.I. 236 at 2-3; *see also* Nov. 1, 2019 Tr. at 22, 40 (denying motion to reconsider))  Consequently, at trial, the jury did not hear a reasonable royalty *rate* opinion from Mimms.  The only reasonable royalty rate opinion the jury heard was from Roche's damages expert, John Jarosz, who testified that, based on his analysis of comparable licenses (including the 1995 License) and the correct 2003-04 date of the hypothetical negotiation, the reasonable royalty *rate* would not exceed 10.5%.  (Jarosz Tr. 1712)

Mimms was permitted to testify about a royalty *base*, which he calculated to be between $170 million and $183 million, and he was further permitted to present his estimate of the profit margin Roche earned on these sales (*see* D.I. 274 at 43-44) (analyzing *Georgia-Pacific*[7] factors 8 and 13), which he opined was "roughly 75%" during the relevant damages period of 2011-19 (Mimms Tr. 775-77).  Mimms further testified that, in order to arrive at a reasonable royalty damages award for Meso, his $183 million royalty *base* would need to be multiplied by an appropriate royalty *rate*.  (Mimms Tr. 786)  But Mr. Mimms was not permitted to offer a royalty *rate* opinion to the jury, and he did not.  Nor did he offer an opinion that Roche's purported profit rate of 75% represented a reasonable royalty rate for Meso.  (*See* Mimms Tr. 747-97; *see also* D.I. 288 at 5)

Mimms did present the jury with a demonstrative containing the following graphic, which the Court permitted (after hearing argument from the parties):

---

[7] *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).



(D.I. 291 Ex. 5 (Mimms Demonstrative); *see also* Tr. 693-709 (attorney argument day before Mimms' testimony); D.I. 269 (Oral Order permitting use of demonstrative))  During closing arguments, Meso's counsel told the jury: "we believe that what is right is that Meso . . . should get the profits, the profits on the $183 million that Roche made in our lane [that is, out-of-field sales]." (Tr. 1832)  The jury's damages award of $137,250,000 can be arrived at (exactly) by multiplying $183 million by 75%.

Roche presents powerful challenges to the jury award but, ultimately, Roche's motion falls short.  A "jury's award of damages is entitled to deference" and "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based on speculation or guesswork." *Monsanto Co v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004). Roche has not satisfied any of these criteria.

Roche contends that the jury's damages award of $137,250,000 is not supported by the evidence because the "only possible calculation yielding the damages award required using the wrong date of hypothetical negotiation and no apportionment for the 'value attributable to the infringing features of the product, **and no more.**'"  (D.I. 288 at 3-4 (quoting *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018)); *see also LaserDynamics, Inc. v. Quanta*

*Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) (explaining that entire market value rule is derived from *Garretson v. Clark*, 111 U.S. 120, 121 (1884), which stated: "the patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative")) Roche further argues that the jury's award amounts to a "disgorgement of all of Roche's profits, as expressly invited by Meso's counsel, which is not permitted by patent law." (D.I. 288 at 4) (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 505 (1964), which explains that Congress amended Section 284 "precisely to eliminate the recovery of profits . . . and allow recovery of damages only"))

The Court agrees with Meso that the jury had a substantial basis for its damages award. The jury was free to credit Meso's contention that the asserted claims "cover core aspects of ECL technology," around which Roche could not design (*see* Wilbur Tr. 528-29, 566, 574-75; Jarosz Tr. 1720-21), and that Roche expected to make (and in fact did make) significant convoyed sales (*see* Ruetsch Tr. 1194-97; P283 (May 2007 memo from Roche's CEO, Dr. Franz Humer, to board laying out justification for BioVeris acquisition, which included "the potential loss on business" in the patient-diagnostic market)). On this reasonable view of the evidence, Mimms' estimations of the royalty base and Roche's profits were conservative; in fact, an appropriate royalty base could have been *higher* than $183 million, as other evidence in the record shows the U.S. share of the global clinical trial testing market was higher than Mimms assumed. (*See* D.I. 303 at 5-6) (citing P351 at *594; Mimms Tr. 758-71, 774-75; D.I. 291 Ex. 5 (Mimms Demonstrative)) The jury could have further credited evidence showing Roche's ECL business regularly outperformed Roche's estimates, which again would support a higher royalty

base.  (*See generally* Mimms Tr. 761-62)  As Meso also emphasizes, in the 2003 License – which was executed right around the time of the hypothetical negotiation – Roche had agreed to a 65% royalty rate for out-of-field sales.  (D.I. 303 at 6-7)

Taking all this into account, the jury could have arrived at its damages award by multiplying the 65% royalty rate negotiated for in the 2003 License times a royalty base of approximately $211 million, which is a base supported by sufficient evidence, once convoyed sales and Mimms' arguably-conservative royalty base assumptions are considered.  Because the verdict sheet did not ask the jury to disclose the royalty rate or base it found,[8] yet their presumed findings on these issues are supported by sufficient evidence, the Court should uphold the damages verdict.  *See generally Unisplay, S.A. v. Am. Elec. Sign. Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (noting that so long as jury chose damages amount "within the range encompassed by the record as a whole," it should be upheld).

Further, on this not unreasonable view of the record, the jury's damages award satisfied the apportionment requirement by only awarding Meso damages based on Roche's out-of-field sales, leaving to Roche all revenues and profits earned on in-field sales – the former having value attributable to Meso's patent rights, the latter not.  That is, the jury could have reasonably concluded that the out-of-field sales would not have occurred without the infringing features,

---

[8] Roche's proposed verdict sheet did include separate jury interrogatories asking for reasonable royalty rate and "the dollar amount of the non-incidental Roche sales outside the Field defined in the 2003 [License], if any, that you find infringe [Meso's] license rights?" (D.I. 270 Ex. A)  Following attorney argument at trial (largely focusing on interrogatories directed to liability findings), the Court instructed the parties that, given the detailed jury instructions, a streamlined verdict sheet was likely more appropriate and requested an amended joint proposal. (*See* Tr. 1603-06)  The Court adopted the parties' subsequently-proposed question on damages, asking: "What amount has [Meso] proved it is entitled to as a reasonable royalty for Roche's infringement of the Asserted Patents?"  (D.I. 275)

rendering all the value of the out-of-field sales attributable to Meso's patent rights.[9]

The jury also heard evidence about the factors that drove Roche's acquisition of BioVeris, which included avoiding the potential loss of in-field sales (i.e., the patient diagnostic field) due to Roche's then-inability to make out-of-field sales (i.e., the clinical trial market). (*See, e.g.*, P283) Evidence at trial revealed Roche's concerns that it might also then lose all follow-on sales for tests and disposables. (*See* Arg. Tr. at 22-23; *see also, e.g.*, P283; Ruetsch Tr. 1194-97) Meso's Jacob Wohlstadter testified that, knowing of Roche's needs, if Roche had bothered to ask Meso for permission to sell in Meso's field, Meso "would have demanded a 'number that started with a B' [i.e., at least $1 billion]." (Wohlstadter Tr. 335-36, 345-46) The jury could have rejected this testimony as self-interested or otherwise unpersuasive, but it was likewise free to credit it, and the Court must presume the jury did the latter. As Meso writes, the jury could have found that "[a]voiding the potential loss of in-field and other convoyed sales was a primary driver of Roche's decision to acquire BioVeris, *see* P283, and would also have been a key factor in any hypothetical negotiation" with Meso. (D.I. 303 at 5)

Simply put, the jury was presented sufficient evidence from which it could have reasonably determined (1) the asserted claims were essential to practice ECL technology, (2) ECL technology was the key driver of demand for Roche's accused products sold out-of-field

---

[9] Roche points out: "[t]he '779 patent expired in 2016 and the '729 patent in 2017 [i.e., during the relevant damages period], yet Meso did not attempt to apportion the value of either of those two patents from the remaining '939 patent." (D.I. 308 at 4; *see also* Arg. Tr. at 13)  Meso responds that the jury had evidence of the expiration dates, suggesting it can be presumed the jury accounted for these facts in its damages decision. (*See, e.g.*, Arg. Tr. at 38-39)  Because the jury could have reasonably found that every Roche sale that is the basis for the damages award necessarily infringed all of the patent rights Meso asserted at trial, it could also have reasonably found that the value of those sales is attributable to each and every one of the four asserted patent claims. Therefore, as Meso states, the expiration dates of the patents are "not particularly relevant." (*Id.*)

(*see, e.g.*, P424), and, thus, (3) a high reasonable royalty award was appropriate. *See generally Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013) ("[A]n infringer's net profit margin is not the ceiling by which a reasonable royalty is capped."); *see also* D.I. 303 at 4 (Meso: "The jury was entitled to conclude that the only way Roche could lawfully make sales in Meso's lane was with a license to the asserted patents.").

It is also notable that Roche did not object to any of the damages instructions the Court gave the jury. For example, the jury was instructed on apportionment (*see* D.I. 274 at 41; Tr. 1793-94) and it is presumed to have followed that instruction, *see generally Richardson*, 481 U.S. at 206. Given the Court's many rulings on damages, the apportionment dispute became a fact dispute for the jury to resolve. *See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F. 3d 1214, 1217-18 (Fed. Cir. 1993) ("The finding of the amount of damages for patent infringement is a question of fact . . . .").

Also, importantly, the opinions Mimms was permitted to present to the jury were constrained because Roche raised meritorious concerns and persuaded the Court to restrict the opinions Mimms could testify to. After prevailing on its *Daubert* motion directed to Mimms, and defeating Meso's repeated efforts to have the Court reconsider that decision (*see, e.g.*, D.I. 244, 253),[10] Roche raised no further meritorious damages-related objections, and was to all appearances content to have the damages issues tried to the jury in precisely the manner they were tried. The implication of Roche's position in its post-trial motion is that the exclusion of certain Mimms opinions effectively made the apportionment problem worse (*see, e.g.*, Arg. Tr. at 7-10), but that is not a meritorious basis for relief, especially when that exclusion was the

---

[10] The Court denied Meso's motion for reconsideration (D.I. 244) at the November 1, 2019 pretrial conference. (*See* Transcript at 23-25) As this ruling is not yet reflected in the case docket, it will be noted in the order accompanying today's opinion.

result of Roche's decision to press a meritorious motion to exclude and then proceed to a (fair) trial on damages (which Roche received). Roche's disappointment with the decision the jury ultimately made is not a valid basis on which to overturn the damages verdict.[11]

Roche further contends that the jury's damages award was the product of impermissible "speculation or guesswork." *Monsanto*, 382 F.3d at 1383. Reasonable minds could differ on this point. In the Court's view, having found (for the reasons already stated) that the damages award is not grossly excessive or monstrous and that it is not clearly unsupported by the evidence – and having instead found substantial evidence in the record that could support the verdict – the slightly better view of the record is that the damages award was not based only on speculation or guesswork.[12]

For these reasons, the Court will deny the damages portions of Roche's motion.[13]

## B. Meso's Motions

### 1. Enhanced Damages

In connection with evaluating Roche's motions, the Court explained that it is vacating the

---

[11] As the Court stated in denying Meso's motion for reconsideration at the pretrial conference – in words that were at that time directed principally to Meso, but are now just as pertinent to Roche: "There's nothing manifestly unjust about having the case going forward based on the rulings that I reached on the contested issues I was asked to decide." (Nov. 1, 2019 pretrial conference tr. at 24)

[12] Roche has also raised a marking challenge, arguing that Meso presented no evidence that its products were marked with the '939 patent or that Meso provided notice to Roche of infringement before January 12, 2018, pursuant to 35 U.S.C. § 287. (D.I. 308 at 4-5) (citing *Arctic Cat Inc. v. Bombardier Rec. Prods. Inc.*, 950 F.3d 860 (Fed. Cir. 2020)) Meso correctly points out, however, that since a marking instruction was proposed by Roche and rejected by the Court (*see* Arg. Tr. 39), there is no live dispute regarding marking.

[13] The parties devote only a small part of their briefs to Roche's request for remittitur. (*See* D.I. 288 at 8; D.I. 303 at 11) In any event, because the jury's damages award is not clearly unsupported by the evidence and/or excessive, the Court cannot grant remittitur. *See, e.g.*, *Cortez v. Trans Union, LLC*, 617 F.3d 688, 715 (3d Cir. 2010).

27

jury's verdict that Roche's infringement was willful. Nonetheless, even if the finding of willfulness were to stand, the Court would also deny Meso's request for enhanced damages.

Pursuant to 35 U.S.C. § 284, the Court may "increase the damages up to three times the amount found or assessed." The party seeking enhanced damages has the burden of proving by a preponderance of the evidence that they should be awarded. *See Halo*, 136 S. Ct. at 1934. "[A]n award of enhanced damages does not necessarily flow from a willfulness finding." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017).

In *Halo*, the Supreme Court explained that "Section 284 gives district courts discretion in meting out enhanced damages." *Id.* at 1932-34. Specifically, "district courts enjoy discretion in deciding whether to award enhanced damages, and in what amount." *Id. Halo* further explains that "enhanced damages are generally appropriate under Section 284 ***only in egregious*** cases. . . . [Enhanced damages are] ***not*** to be meted out in a ***typical*** patent infringement case." *Id.* at 1932 (emphasis added). Importantly, nothing in the willfulness standard means "enhanced damages ***must*** follow a find of egregious misconduct. As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Id.* at 1933 (emphasis added).

All the reasons the Court already gave above for why the willful infringement verdict cannot stand also demonstrate why, even if there is sufficient evidence of willfulness, there is not evidence of egregious conduct by Roche. True, the Court already held this is not a typical patent infringement case. In the context of the enhancement inquiry, however, the atypicality cuts ***against*** Meso. That is, this case is not even a run-of-the-mill infringement case, so it does not even rise to the level of conduct that courts typically find to be ***less*** than what is required to warrant enhanced damages. *See Halo*, 136 S. Ct. at 1932 ("Awards of enhanced damages under

the Patent Act over the past 180 years establish that they are not to be meted out in a typical

infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious

infringement behavior."); *see also Sprint Communications Co. L.P. v. Time Warner Cable, Inc.*,

2017 WL 978107, at *14 (D. Kan. Mar. 14, 2017) ("[T]he fact that the infringer acted pursuant

to a financial motive does not distinguish this case from the garden-variety infringement case.");

*Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co, Inc.*, 226 F.

Supp. 3d 520, 531 (W.D.N.C. 2016), *aff'd*, 721 Fed. App'x 989 (Fed. Cir. 2018) ("In exercising

that discretion, the Court remains mindful that enhanced damages are designed to punish

egregious infringement behavior and should not [be] imposed in the run-of-the-mill case.

As Roche persuasively states:

> This case differs from the typical patent infringement case
> because infringement turns not on the language of a patent claim
> but on contractual language that the Court found ambiguous.
> Roche – not Meso – brought this action in an effort to achieve
> clarity as to Meso's license. The jury agreed with Meso's
> interpretation, but Roche's interpretation – supported by testimony
> of nearly every IGEN and BioVeris witness – was reasonable and
> Roche's actions in accordance with that interpretation were not
> egregious. A review of the entire record shows that any
> infringement of Meso's license does not justify enhancement of
> damages.

(D.I. 304 at 1-2)

The Court's conclusion is further supported by consideration of the enhancement factors

articulated in *Read Corp. v. Portec, Inc.*, 970 F.3d 816 (Fed. Cir. 1992),[14] as follows:

---

[14] The *Read* factors are: (1) whether the infringer deliberately copied the invention;
(2) whether the infringer, when aware of the patent, investigated and formed a good faith belief
of invalidity or noninfringement; (3) the infringer's behavior as a party to litigation;
(4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's
misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and,
(9) whether defendant attempted to conceal its misconduct. 970 F.2d at 826-28.

*Copying.* This factor weighs in favor of Roche, who correctly notes it was permitted to develop accused products for its own in-field use. (D.I. 304 at 9)

*Good-Faith Belief.* This factor weighs in favor of Roche. The evidence demonstrates that Roche had a good faith belief in its reasonable interpretation of the relevant contract provisions.

*Litigation Conduct.* This factor is neutral. Meso agrees that this was a hard-fought case and alleges no misconduct by Roche's legal team. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 762 F. Supp. 2d 7110, 721-22 (D. Del. 2011).

*Size and Financial Condition*. This factor weighs slightly in favor of Meso. Roche has become the leader in ECL technology-based diagnostics, earning billions of dollars in revenues over the relevant damages period (*see, e.g.*, Mimms Tr. 787), due at least in part to its 2007 removal of the label restriction on out-of-field uses (*see* Ruetsch Tr. 1195-99; Ex. P283). *See also Arctic Cat Inc. v. Bombardier Rec. Prods., Inc.*, 198 F. Supp. 3d 1343, 1352 (S.D. Fla. 2016) ("[E]nhancement of damages is particularly warranted [where defendant] is a multi-billion dollar enterprise and the market leader – due in significant part to sale of product found to willfully infringe [plaintiff's] patents.").

*Close Case.* This factor weighs heavily in Roche's favor, for all the reasons already stated with respect to the closeness of the contract interpretation dispute. Meso's contention that the speed of the jury deliberation (just two hours) means this was not a close case and, hence, supports willfulness is unpersuasive. *See Vectura Ltd. v. GlaxoSmithKline LLC*, 2019 WL 4346502, at *4 n.3 (D. Del. Sept. 12, 2019) (finding length of jury deliberation not a "meaningful metric" in enhancement determination).

*Length of Misconduct.* This factor weighs in Roche's favor. As Roche contends, and

this Court has previously held, this *Read* factor "should weigh against enhancement where, as here, construction of unclear or ambiguous terms is necessary before an infringement determination can be made." (D.I. 304 at 12) (pointing to *Idenix Pharm. LLC v. Gilead Sci., Inc.*, 271 F. Supp. 3d 694, 702 (D. Del. 2017)) This analysis applies even as here the ambiguity is not in a patent but in a contract.

      *Remedial Action.* This factor is neutral. Neither party has provided a persuasive reason to find that this factor supports or disfavors enhancement.

      *Motivation to Harm.* This factor weighs in favor of Roche. While Meso presented evidence that it has competed with (or at least operated within the same market as) Roche with respect to ECL technologies (D.I. 291 at 14-15), ordinary competition driven by a profit motive does not constitute the motivation to harm with which this *Read* factor is concerned. *See Finjan Software, Ltd. v. Secure Computing Corp.*, 2009 WL 2524495, at *16 (D. Del. Aug. 18, 2019) (desire "to compete with and emulate" patented technology "may not be enough to show the motivation to inflict harm necessary to warrant enhanced damages").

      *Concealment.* This factor is neutral. Evidence at trial indicated that, following its 2007 acquisition of BioVeris, Roche stopped tracking or investigating how its customers were using its ECL products. (Griffin Tr. 1409) But, given its good faith, reasonable belief that the acquisition meant the elimination of field-of-use restrictions – and, hence, no possibility of patent liability – there was no business reason to continue such tracking. The Court is not persuaded that Roche's non-tracking was the result of an attempt to conceal.

      For all of these reasons, the Court would not award enhanced damages even if it were upholding the verdict of willful infringement. This portion of Meso's motion will be denied as moot.

### 2.     Prejudgment Interest

Meso seeks an award of prejudgment interest pursuant to 35 U.S.C. § 184.  "Prejudgment

interest should normally be awarded in patent cases to provide patent owners with complete

compensation." *Idenix*, 271 F. Supp. at 705 (internal quotation marks omitted).  However, courts

may "deny [prejudgment interest] altogether, where" the requesting party "has been responsible

for undue delay in prosecuting the lawsuit." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648,

657 (1983).  This Court's common practice is to award prejudgment interest calculated at the

prime rate, compounded quarterly, from the day of the first infringement through the date of

judgment.  *See, e.g., Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 363-64 (D. Del. 2018);

*Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 627-28 (D.

Del. 2018); *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768,

783 (D. Del. 2015).

The Court has been presented with no persuasive reason to depart from its standard

practice.  Roche has failed to show that Meso acted with "undue delay" in filing or prosecuting

its suit. (*See* D.I. 304 at 15-16)  The same reasons the Court gave for rejecting Roche's equitable

estoppel defense support the Court's conclusion here.  Unlike in *Crystal Semiconductor v.

TriTech Microelectronics Int'l*, 246 F.3d 1336, 1372 (Fed. Cir. 2001), a case on which Roche

relies (*see* D.I. 304 at 15) and in which the Federal Circuit affirmed denial of prejudgment

interest where a two-year delay in filing suit was a "litigation tactic," there is no comparable

evidence here.

Roche has also failed to demonstrate it suffered prejudice from Meso's purported delay in

pressing this case.  "[A]bsent prejudice . . . any delay . . . does not support the denial of

prejudgment interest." *Lummus Indus. Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir.

1988).

Roche's argument that if prejudgment interest is awarded it should be at the lower U.S. Treasury Bill rate also lacks merit. "[I]t is not necessary that a patentee demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). There is, then, nothing left to Roche's opposition to the prejudgment interest award being at the prime rate.

Accordingly, this portion of Meso's motion will be granted. Roche will be ordered to pay prejudgment interest at the prime rate, compounded quarterly, from the date of first infringement until the date of judgment.

### 3.     Post-Judgment Interest

Meso seeks an award of post-judgment interest at the statutory rate. (*See* D.I. 291 at 17) (citing 28 U.S.C. § 1961(a))  Roche does not oppose this request. (*See* D.I. 304 at 15-16; D.I. 307 at 7)  Accordingly, this portion of Meso's motion will be granted.

### 4.     Running Royalties

The jury found that Roche infringed claim 33 of the '939 patent. (D.I. 276)  That claim does not expire until June 29, 2021.  Meso moves for royalties on Roche's ongoing out-of-field sales of ECL products that use a sulfonated ruthenium label. (D.I. 291 at 18)

Where a jury's verdict is based only on prejudgment infringement, awarding an "ongoing royalty is appropriate because the record supports the . . . finding that [the patentee] has not been compensated for . . . continuing infringement." *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378-79 (Fed. Cir. 2010); *see also Godo Kaisha IP Bridge 1 v. TCL Commc'n tech. Holdings Ltd.*, 2019 WL 1877189, at *4 (D. Del. Apr. 26, 2019) ("[P]atentees are entitled to supplemental damages accounting for any infringing sales that occurred before the verdict but that were not reflected in the last financial discovery produced."); 35 U.S.C. § 283 (authorizing "injunctions in accordance with the principles of equity").  Determining the amount of the

ongoing royalty is "committed to the sound discretion of the district court." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1364 n.2 (Fed. Cir. 2008).

"Generally, the jury's damages award is a starting point for evaluating ongoing royalties." *Vectura Ltd. v. GlaxoSmithKline LLC*, 2019 WL 4346502, at *7 (D. Del. 2019). Although the jury was not asked to specify a royalty base or royalty rate, the Court agrees with Meso that it should use 6.3% of Roche's U.S. sales of ECL products utilizing a sulfonated ruthenium label as its royalty base. (*See* D.I. 291 at 22)  The Court further agrees with Meso that the jury appears to have rejected the only royalty rate it heard – Jarosz's 10.5% of infringing sales revenue. (*See id.*)  For all the reasons stated by Meso in its motion (*see id.* at 19-22), and the Court in connection with upholding the jury's damages verdict (*see supra* § III.A.4), the Court finds that a reasonable royalty rate in the context of ongoing royalties is 25%.  In the Court's view, this royalty rate accounts for both parties' arguments and evidence, including Roche's suggestion of a 3% royalty rate or at most 10.5% and evidence that its bargaining position has improved since the 2003-04 hypothetical negotiation date (*see* D.I. 304 at 17-20) as well as Meso's responses to those contentions (*see* D.I. 307 at 8-11).

The parties will be directed to meet and confer and submit a proposed order, consistent with the Court's rulings, that calculates the running royalty that has accrued to date and an agreed-upon procedure for calculating running royalties going forward through the expiration of the '939 patent.

### 5.    Breach of Contract

Meso asserted a breach of contract counterclaim against BioVeris based on BioVeris's refusal to pay the costs of this litigation.  (D.I. 42-1 at ¶¶ 150-54)  The parties agreed that Section 4 of the 1995 License governs this dispute and that the Court should address it after the jury returned a verdict on Meso's patent infringement claims.  (*See* D.I. 238 at 15-16; Nov. 1, 2019

Hrg. Tr. at 57)  Meso now moves for judgment on its counterclaim, seeking only nominal

damages.  (D.I. 291 at 23-25)

> Section 4 of the 1995 License provides:
>
>> If during the term of this Agreement [Meso] becomes aware of an
>> infringement of any Licensed Technology that materially impairs
>> [Meso's] rights hereunder, it shall notify IGEN, and [Meso] and
>> IGEN will confer and determine what actions may be taken to
>> protect [Meso's] rights under the Licensed Technology.  The
>> prosecution of such infringers shall be at the direction of [Meso],
>> and at the expense of IGEN.  In the event any prosecution results
>> for the expenses of prosecuting infringers, and any remaining
>> recovery shall be retained by [Meso].

(D.I. 291 at 24 (citing P16 at *362); D.I. 304 at 22 (citing P12 at *679-80))

The Court agrees with Meso that BioVeris has breached this provision.  In its Answer,

BioVeris admits: (1) it succeeded to IGEN's rights and responsibilities under the 1995 License

(D.I. 48 at ¶ 51); (2) Meso fulfilled its obligation to notify BioVeris of its infringement claim (*id.*

at ¶ 152); and (3) BioVeris refused to pay any of the costs of the infringement litigation against

Roche (*id.* at ¶ 153).  Further, the jury has now found that Meso has exclusive rights to the

entirety of the asserted claims (and the Court is upholding the verdict).  (D.I. 291 at 24)  It

follows from all of this that Meso has proven by a preponderance of the evidence that BioVeris

has breached its contractual obligations.

In opposing this portion of Meso's motion, BioVeris contends that Meso must also prove

that its rights have been materially impaired and that Meso failed to meet this burden.  (*See* D.I.

304 at 21-25)  The Court disagrees.  As Meso correctly points out, "[t]here is no basis to

conclude that the word 'materially' in Section 4 of the [1995 License] requires proof of lost

profits or sales."  (D.I. 307 at 11)  In any event, the jury's finding that Roche infringed Meso's

patent rights – and caused damages to Meso in excess of $137 million – is sufficient

demonstration that Meso's rights have been materially impaired.

This portion of Meso's motion will be granted.

## IV.    CONCLUSION

An appropriate Order follows.